IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MICHAEL B. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| CITY PLAZA, LLC, T.E. JOHNSON | )   1:19CV924 |
| & SONS, INC., and ONLINE | ) |
| INFORMATION SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant City Plaza, LLC's Motion to Dismiss pursuant to Rule 12(b)(6) [Doc. #12], Defendant T.E. Johnson & Sons, Inc.'s Motion to Dismiss pursuant to Rule 12(b)(6) [Doc. #14], and Defendant Online Information Services, Inc.'s Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) [Doc. #21]. For the reasons that follow, Online Information Services, Inc.'s Motion to Dismiss is granted in part as to Counts Three and Five. Because those two federal claims are the only bases for subject matter jurisdiction and the Court declines to exercise supplemental jurisdiction over the remaining state law claims, they are dismissed without prejudice.

I.

Plaintiff Michael B. Jones terminated his lease at Village Lofts early, gave notice, and vacated his apartment on December 19, 2017 after paying that month's rent in full. (Compl. ¶¶ 26-29 [Doc. #1].) A new tenant paying more per month than Jones began leasing the apartment on January 6, 2018. (Id. ¶ 30;

compare id. ¶ 24 with id. ¶ 31.) Jones had given a $200 security deposit to City Plaza, LLC ("City Plaza"), the owner of Village Lofts, and T.E. Johnson & Sons, Inc. ("T.E.J."), the property manager. (Id. ¶¶ 5, 8, 25.) However, T.E.J. refused to return the security deposit after Jones vacated the premises and, instead, sent Jones a letter demanding payment of $454.60 for charges of $504.00 for "Early Term- paint, clean and make ready" and $150.60 for "6- days rent" to which it applied Jones's $200 security deposit. (Id. ¶¶ 32, 33 (citing Ex. C to Compl., Letter from T.E.J. to Jones (Jan. 30, 2018)).)

Jones did not believe the law permitted City Plaza and T.E.J. to use his security deposit for what he understood to be normal wear and tear or towards six days' rent because City Plaza suffered no actual damages, so he attempted to resolve the dispute. (Id. ¶¶ 35-41.) A T.E.J. employee responded to Jones by email, advised him to consult with an attorney who specializes in North Carolina real estate law, acknowledged that normal wear and tear is not usually recoverable, but because he breached his lease, he owed "the actual cost associated with getting the property back ready to market." (Id. ¶ 41 (citing Ex. D to Compl., Email from Cathy Robertson to Jones (Mar. 30, 2018)).) Jones also attempted to resolve the dispute through the Better Business Bureau and the North Carolina Real Estate Commission and alleges that the responses to those inquiries from T.E.J. and its lawyer, respectively, misrepresented the law on the permitted use of a security deposit. (Id. ¶¶ 43-48.)

2

"Sometime in 2018", T.E.J. "falsely" reported Jones's "bogus" $454.60 debt to Online Information Services, Inc. ("Online"), which provides collection services for property managers and a Rental Exchange where property managers can report monies owed by former tenants, among other information that allows for tenant screening and credit risk assessment. (Id. ¶¶ 12, 16, 17, 50, 51.) "On information and belief, ONLINE . . . maintains a 'file' . . . on Mr. Jones in its . . . Rental Exchange database" that "[o]n information and belief" "contains false information concerning the bogus $454.60 debt to TEJ." (Id. ¶¶ 52, 53.) In addition, neither of Online's websites identified a toll-free number for consumers to call to request a consumer report and one of its websites "intentionally obscures the fact that ONLINE maintains files or prepares consumer reports subject to the Fair Credit Reporting Act's disclosure requirements." (Id. ¶¶ 56, 57 (citing Exs. G & H to Compl).) Jones called the toll-free number on Online's Consumer page to request a copy of Online's Rental Exchange file on him, but the employee "did not agree to provide a copy of Mr. Jones's consumer report" and instead "obscured the fact that ONLINE maintains files and prepares consumer reports" and referred Jones "to a website where he could obtain reports from TransUnion, Experian, and Equifax." (Id. ¶¶ 60-62.)

Meanwhile, Online reported the debt to those three consumer reporting agencies ("CRAs"): TransUnion, Experian, and Equifax. (Id. ¶ 51.) In February 2019, Jones contacted Experian to dispute the debt which forwarded the dispute to Online. (Id. ¶¶ 64, 65.) Jones himself contacted Online directly in late April

2019 "laying out in detail why the $454.60 was bogus under North Carolina law"; yet, "on information and belief, ONLINE never bothered to conduct the [requisite] reasonable investigation" or to respond to Jones. (Id. ¶¶ 67, 68.) Online has continued reporting "the bogus debt" to TransUnion and Experian, "falsely reporting to Experian that it 'resolved' Mr. Jones's dispute." (Id. ¶¶ 66, 69.) Jones has suffered emotional distress and "has been refused credit, causing him to miss potentially profitable business opportunities." (Id. ¶¶ 71, 72.)

Jones alleges that City Plaza and T.E.J. violated the North Carolina Tenant Security Deposit Act, specifically N.C. Gen. Stat. § 42-51 and § 42-52, and the North Carolina Debt Collection Practices Act, specifically N.C. Gen. Stat. § 75-54 and § 75-55. (Id. ¶¶ 73-76 (Count One), ¶¶ 77-81 (Count Two).)

He alleges that Online violated North Carolina's Collection Agency Act, specifically N.C. Gen. Stat. § 58-70-95(3), the Fair Debt Collection Practices Act, specifically 15 U.S.C. § 1692e(8), and the Fair Credit Reporting Act ("FCRA"), specifically 15 U.S.C. § 1681j(a)(1)(A) and § 1681i. (Id. ¶¶ 85-87 (Count Four), ¶¶ 82-84 (Count Three), ¶¶ 88-91 (Count Five).)

II.

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

4

for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014). Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 555.

A.

Section 42-51(a) of North Carolina General Statutes lists the "only" permitted uses for a residential security deposit, including "[t]he tenant's possible nonpayment of rent . . . ", "[d]amages as the result of the nonfulfillment of the rental period . . . ", and "[t]he costs of re-renting the premises after breach by the

5

tenant . . . ." Section 42-52 instructs landlords on their obligations with respect to a security deposit, including prohibiting the "withhold[ing] as damages part of the security deposit for conditions that are due to normal wear and tear" and the retention of "an amount from the security deposit which exceeds his actual damages."

At the heart of City Plaza's and T.E.J.'s motions to dismiss is the interplay of § 42-51(a) and § 42-52. First, there is the question of whether a security deposit may be used to pay for repainting and cleaning as "[t]he costs of re-renting the premises after breach by the tenant" when it may not be withheld as damages for conditions that are due to normal wear and tear such as those that necessitate repainting and cleaning. City Plaza and T.E.J. argue that these costs are recoverable because Jones breached his lease and a landlord has a duty to mitigate damages by finding a new tenant as quickly as possible, (see Br. of Def. City Plaza, LLC ("City Plaza's Br. in Supp.") at 4-9 [Doc. #16]), and "[t]he limitation as to ordinary wear and tear in [§ 42-52] does not mention costs", (see Mem. in Supp. of Mot. to Dismiss by Def. T.E.J. ("T.E.J.'s Mem. in Supp.") at 4-8 [Doc. #17]). Jones responds that all of the expenses listed in § 42-51 are damages limited by § 42-52. (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. to Dismiss ("Pl.'s Mem. of Law in Opp'n") at 9-17 [Doc. #24]. Despite the parties' arguments, none cite North Carolina case law in support of their positions (in fact, City Plaza and Jones cite no case at all), and T.E.J. acknowledges that "[t]here is no case in North Carolina that addresses this principle directly". (See City Plaza's Br. in Supp.

6

at 4-9; T.E.J.'s Mem. in Supp. at 4-8; Pl.'s Mem. of Law in Opp'n at 9-17; Reply Br. of Defs. City Plaza & T.E.J. ("Reply Br.") at 3-5 [Doc. #25].) The Court has likewise found no case addressing this issue.

There is also the question of whether a landlord may apply a security deposit towards unpaid rent when it has not suffered actual damages from lost rent. City Plaza argues that it is permitted to use Jones's security deposit towards the "nonpayment of rent" as "damages as the result of the nonfulfillment of the rental period". (City Plaza's Br. in Supp. at 4.) Jones responds that the new tenant's higher monthly payment put City Plaza in a better position than it would have been had he fulfilled his lease. (Pl.'s Mem. of Law in Opp'n at 5-9.) Therefore, because City Plaza suffered no actual damages from Jones's breach, § 42-52 prohibits the collection of six days' rent. (Id. at 9.) Apparently in an attempt to clarify City Plaza's initial melding of two provisions in § 42-51, City Plaza and T.E.J. respond together that they have not pursued the rent as "[d]amages as a result of nonfulfillment of the rental period", which they agree "a landlord would not be entitled to recover" "in the event a new tenant actually pays a landlord a higher rent for the balance of the original lease term". (Reply Br. at 3.) They argue, instead, that they are collecting the rent as "nonpayment of rent", which § 42-52 "does not limit". (Id. at 4.)

B.

Importantly, these questions of law affect Jones's claims against Online, including Counts Three and Five on which this Court's original jurisdiction rests. In

7

Count Three, Jones alleges that Online, a debt collector, violated 15 U.S.C. § 1692e(8) when it "communicated information about a debt which it knew or which it should have known to be bogus to TransUnion, Experian, and Equifax in March and April 2019". (Compl. ¶ 83.) Online argues that "[i]f the Court accepts the arguments of City Plaza and TEJ as to the handling of the tenant deposit, then the Court must necessarily dismiss [Count Three] because Online's reporting of the debt was accurate." (Def. Online's Mem. in Supp. of its Mot. to Dismiss ("Online's Mem. in Supp.") at 6 [Doc. #22].)

In Count Five, Jones alleges that Online, a nationwide specialty consumer reporting agency[1], violated 15 U.S.C. § 1681j(a)(1)(A) and (a)(1)(C)(i) when it failed to maintain a "'streamlined process'" and toll-free telephone number for him to be able to obtain one free copy of his Rental Exchange consumer report and 15 U.S.C. § 1681i when it failed to investigate his April 2019 dispute. (Compl. ¶¶ 89, 90.) As to the § 1681j claim, Online contends that Jones has not alleged an injury in fact to support Article III standing to bring the claim because not only has he failed to allege sufficiently any false information maintained by Online, but his only allegation of injury is a hypothetical harm. (Online's Mem. in Supp. at 10-12 (citing Compl. ¶ 63).) Jones responds that his allegation in paragraph 63 of the Complaint – that he was subjected to "the risk that a [CRA] would maintain a file

---

[1] A nationwide specialty consumer reporting agency "means a [CRA] that compiles and maintains files on consumers on a nationwide basis relating to", in relevant part, "residential or tenant history". 15 U.S.C. § 1681a(x).

8

on him that included false derogatory information that would likely lead to future adverse action (e.g., being refused a residential lease or being required to pay a larger security deposit than he would have otherwise been required to pay), without the opportunity to dispute and demand reinvestigation of the false derogatory information beforehand" – sufficiently comports with the standing requirements as applied in Curtis v. Propel Property Tax Funding, LLC, 915 F.3d 234 (4th Cir. 2019), and that he also alleged he suffered emotional distress. (Pl.'s Mem. of Law in Opp'n at 19-20.)

As to the § 1681i claim, Online contends that, not only is the information it reported factually accurate, but this claim is a collateral attack on the legal validity of the debt which is not permitted under § 1681i. (Online's Mem. in Supp. at 8-9.) Notably, Jones does not appear to oppose the characterization of his claim as an attack on the legal validity of the debt, but he instead argues that Online "was still under an obligation to conduct a reasonable investigation" and yet "did absolutely nothing." (Pl.'s Mem. of Law in Opp'n at 18-19.)

1.

Because the analysis of Jones's § 1681i claim informs that of his § 1681j and § 1692e(8) claims, § 1681i provides the starting point. "The FCRA seeks to ensure 'fair and accurate credit reporting.'" Spokeo, Inc. v. Robins, ___ U.S. ___, 136 S. Ct. 1540, 1545 (2016) (quoting 15 U.S.C. § 1681(a)(1)). When a consumer disputes the completeness or accuracy of information contained in the file of a CRA, § 1681i requires the CRA to "conduct a reasonable reinvestigation to

9

determine whether the disputed information is inaccurate . . . ." To bring a claim under § 1681i, a consumer "must first show that his 'credit file contains inaccurate or incomplete information.'" Hinton v. Trans Union, LLC, 654 F. Supp. 2d 440, 451 (E.D. Va. 2009) (quoting Thomas v. Trans Union LLC, 197 F. Supp. 2d 1233, 1236 (D. Or. 2002)). "A report is inaccurate when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to [have an] adverse effect." Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001) (alteration in original) (internal quotation marks and additional alteration omitted). "To determine whether a consumer has identified a factual inaccuracy on his or her credit report that would activate § 1681i's reinvestigation requirement, [t]he decisive inquiry is whether the defendant credit bureau could have uncovered the inaccuracy if it had reasonably reinvestigated the matter." DeAndrade v. Trans Union LLC, 523 F.3d 61, 68 (1st Cir. 2008) (internal quotation marks omitted and alteration in original).

However, claiming a factual inaccuracy is different than asserting a legal challenge to the debt. "Claims brought against CRAs based on a legal dispute of an underlying debt raise concerns about 'collateral attacks' because the creditor is not a party to the suit". Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 150 (4th Cir. 2008). "Because CRAs are ill equipped to adjudicate [legal] disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims."

10

Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876, 891 (9th Cir. 2010) (citing Saunders, 526 F.3d at 150).

For example, in DeAndrade, the plaintiff financed new windows for his residence only to learn later that a mortgage on the residence had been granted to the company to whom he had been making payments, KeyBank, and his signature on related documents appeared to be forged. 523 F.3d at 63. After the plaintiff stopped paying KeyBank pending the resolution of the matter, KeyBank reported the alleged delinquent payments to TransUnion, Equifax, and Experian. Id. at 64. The plaintiff then sent a letter to each CRA "advising them that the mortgage underlying the negative item reported by KeyBank had been fraudulently obtained and urging the [CRAs] to investigate the transaction." Id. KeyBank confirmed the plaintiff's identifying information and delinquent payments after which TransUnion continued reporting the KeyBank debt on the plaintiff's credit report, leading the plaintiff to sue TransUnion for violating § 1681i. Id.

The First Circuit Court of Appeals characterized the plaintiff's challenge as an attack on the mortgage's validity, and "[w]hether the mortgage is valid turns on questions that can only be resolved by a court of law". Id. at 68. Affirming summary judgment in TransUnion's favor, the court explained, "This [was] not a factual inaccuracy that could have been uncovered by a reasonable investigation, but rather a legal issue that a credit agency such as Trans Union is neither qualified nor obligated to resolve under the FCRA." Id. (citing Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991) ("No reasonable

11

investigation on the part [of the credit agency] could have uncovered an inaccuracy in [the plaintiff's] report because there was never any factual deficiency in the report."). "Determining whether [the plaintiff] was entitled to stop making those payments is a question for a court to resolve in a suit against KeyBank . . . not a job imposed upon consumer reporting agencies by the FCRA." Id. "In essence, [the plaintiff] had crossed the line between alleging a factual deficiency that Trans Union was obliged to investigate pursuant to the FCRA and launching an impermissible collateral attack against a lender by bringing an FCRA claim against a consumer reporting agency." Id.

The Carvalho court expressed the same concerns when the plaintiff sued CRAs for violating a California law "substantially based on the [FCRA]" that requires CRAs to reinvestigate when a consumer disputes the completeness or accuracy of information in her file. 629 F.3d at 889, 891-92. The CRAs were reporting a collection account for medical services that was past due, but the plaintiff maintained that her medical provider Bayside did not properly or timely request payment from her insurer. Id. at 883, 891. The plaintiff conceded that the information on her credit report was correct on its face, but argued that it "was misleading because she was not legally obligated to pay the Bayside bill until Bayside had properly billed her insurer". Id. at 891. Affirming summary judgment in favor of the CRAs, the Ninth Circuit Court of Appeals explained "that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts." Id. at 892. Instead, "a consumer disputing the legal

12

validity of a debt that appears on her credit report should first attempt to resolve the matter directly with the creditor or furnisher, which 'stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation.'" Id. (quoting Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1156 (9th Cir. 2009)).

More recently, the Western District of Virginia assessed a plaintiff's § 1681i claim similarly. After the plaintiff began leasing a vehicle, he filed a petition for bankruptcy, then voluntarily assumed the lease. Perry v. Toyota Motor Credit Corp., No. 1:18CV34, 2019 WL 332813, at *1 (W.D. Va. Jan. 25, 2019). After the bankruptcy court granted a discharge of the plaintiff's debts, the plaintiff continued receiving billing statements, which he paid for some time until he was no longer able and the vehicle was repossessed. Id. Even after the vehicle was repossessed, the plaintiff received billing statements and was told that he had signed an assumption of the lease and was responsible for the debt. Id. The debt was reported to Experian, Equifax, and TransUnion, which listed the past-due balance and did not reference the account's inclusion in bankruptcy. Id. at *2. The plaintiff sent multiple letters to the CRAs disputing the debt, and ultimately the plaintiff sued them for violating § 1681i. Id. at *2, 3.

As the court described, "The parties' dispute as to whether there are inaccuracies in the reporting of Perry's Toyota account stems from their disagreement over whether his lease assumption agreement, made pursuant to Bankruptcy Code § 365(p), was included in his subsequent bankruptcy discharge."

13

Id. at *4; see id. at *5 (noting that courts are split on "the question of whether a § 365(p) lease assumption agreement remains enforceable following a discharge even if the agreement was not reaffirmed under § 524(c)"). The court found that the plaintiff's claims did not dispute the accuracy of any facts, but instead "present a legal defense to payment – he is not liable for the lease he assumed because he did not reaffirm it, and thus it was included in his bankruptcy discharge." Id. at *5. "The proper resolution of a legal defense to payment of the debt is not generally the kind of error that a CRA could discover or resolve through a review of information from consumers, furnishers, or its own files." Id. After citing DeAndrade, Cahlin, and Saunders, the court dismissed the § 1681i claim. Id. at *5, *6, *8.

Here, Jones sent Online a letter in April 2019 "laying out in detail why the $454.60 was bogus under North Carolina law", (see, e.g., Compl. ¶ 67), which challenges the legal validity of the debt, not its factual accuracy. Jones maintains that T.E.J. and City Plaza are not lawfully entitled to the $454.60, and he has sued them accordingly. But, to sue Online for violating § 1681i is nothing more than an impermissible collateral attack on the debt. Jones expresses frustration that Online not only failed to conduct a reasonable investigation, but neglected to conduct any investigation whatsoever. (See Pl.'s Mem. of Law in Opp'n at 18-19.) However, "[n]o reasonable investigation on the part of [Online] could have uncovered an inaccuracy in [Jones's] report because there was never any factual

14

deficiency in the report." See Cahlin, 936 F.2d at 1160.  Jones has, therefore, failed to state a claim against Online for violating 15 U.S.C. § 1681i.

2.

It is also determined that Jones lacks standing to pursue his claim that Online violated 15 U.S.C. § 1681j because he has alleged no concrete harm.  As the United States Supreme Court explained when assessing a plaintiff's standing to bring FCRA claims, "the 'irreducible constitutional minimum' of standing consists of three elements" – "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 136 S. Ct. at 1547 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).  An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan, 504 U.S. at 560).  A particularized injury "affect[s] the plaintiff in a personal and individual way." Id. (quoting Lujan, 504 U.S. at 560 n.1).  A concrete injury "must actually exist"; it is "real, not abstract" even if intangible. Id. at 1548-49.  Yet, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Id. at 1549.  Because "Article III standing requires a concrete injury even in the context of a statutory violation", a plaintiff "could not, for example, allege a bare procedural violation, divorced from any concrete harm,

15

and satisfy the injury-in-fact requirement of Article III." Id. Yet, "in some circumstances", "the risk of real harm" can "satisfy the requirement of concreteness" and the plaintiff "need not allege any additional harm beyond the one Congress has identified." Id. (citing Restatement (First) of Torts on libel and slander per se; Fed. Election Comm'n v. Akins, 524 U.S. 11, 20-25 (1998); Public Citizen v. Dep't of Justice, 491 U.S. 440 (1989)).

As the Spokeo Court said, with the passage of the FCRA "Congress plainly sought to curb the dissemination of false information by adopting procedures designed to decrease that risk." Id. at 1550. Yet, "alleging a bare procedural violation" of the FCRA does not "satisfy the demands of Article III" because "[a] violation of one of the FCRA's procedural requirements may result in no harm." Id. Such is the case here. Jones has not alleged that he was unable to secure a residential lease or was required to pay a larger security deposit as a result of the information contained in Online's Rental Exchange file on Jones. Instead, he alleges that Online's efforts to deprive him of an opportunity to view his file subjected him "to the risk of a harm that Congress enacted 15 U.S.C. § 1681j to prevent". (Compl. ¶ 63.) Yet, as described above, the inclusion of the $454.60 debt in Online's Rental Exchange file on Jones is not inaccurate, and with no guidance on the interplay of N.C. Gen. Stat. § 42-51 and § 42-52, it cannot be said to be false. For these reasons and others, this case is distinguishable from Curtis. Therefore, Jones is not facing "the real risk of harm" that Congress identified when it enacted § 1681j or the FCRA more generally. Although Jones

16

may have alleged a particularized harm, he has not alleged a concrete harm, which is fatal to his standing to bring the § 1681j claim against Online.

3.

The questions of law surrounding the interplay between N.C. Gen. Stat. § 42-51 and § 42-52 also affect Jones's claim that Online violated 15 U.S.C. § 1692e(8) when, as a debt collector, it allegedly "communicated information about a debt which it knew or which it should have known to be bogus". (Compl. ¶ 83; compare id. with 15 U.S.C. § 1692e(8) (prohibiting the communication of information the debt collector knew or should have known to be false).) Black's Law Dictionary defines false as "Untrue", "Deceitful; lying", "Not genuine; inauthentic", and "Wrong; erroneous". *False*, Black's Law Dictionary (11th ed. 2019). As explained above, whether or not T.E.J. and City Plaza are lawfully entitled to the $454.60 that Online reported as owing is a legal question involving Jones, City Plaza, and T.E.J. to be decided by a court. It cannot be said that, in March and April 2019, Online knew or should have known that the $454.60 owed to City Plaza and T.E.J. was false. Accordingly, Jones has failed to state a claim that Online violated § 1692e(8).

C.

Having dismissed the only claims over which this Court has original jurisdiction and facing a novel issue of state law, the Court declines to exercise supplemental jurisdiction over the remaining state claims. See 28 U.S.C.

§ 1367(c)(1), (3). Defendants' motions to dismiss those claims are denied as moot, and the claims are dismissed without prejudice.

III.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant Online Information Services, Inc.'s Motion to Dismiss [Doc. #21] is GRANTED IN PART as to Counts Three and Five and DENIED IN PART AS MOOT as to Count Four; Defendant City Plaza, LLC's Motion to Dismiss [Doc. #12] is DENIED AS MOOT; Defendant T.E. Johnson & Sons, Inc.'s Motion to Dismiss [Doc. #14] is DENIED AS MOOT; and Counts One, Two, and Four are dismissed without prejudice.

This the 29th day of April, 2020.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge